UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EDWARD LEE GILLIAM,

     Plaintiff,

v.                  Case No:  2:16-cv-255-FtM-29CM

U.S. DEPARTMENT OF VETERANS
AFFAIRS,

     Defendant.

_____

**OPINION AND ORDER**

     This matter comes before the Court on Defendant's Motion to Dismiss or for a More Definite Statement (Doc. #49) filed on February 1, 2018.  Plaintiff filed a Response (Doc. #53) on March 7, 2018.  For the reasons set forth below, the Court grants Defendant's Motion to Dismiss.

**I.**

     This case arises out of the 2012 termination of Plaintiff Edward Lee Gilliam's employment as a police officer at the Fort Myers Outpatient Clinic (the Clinic) of the Bay Pines Veterans Administration (Bay Pines VA).  On February 27, 2017, Plaintiff - a Protestant, Caucasian male of Northern European descent - filed a *pro se* Amended Complaint (Doc. #17) against the United States Department of Veterans Affairs (Defendant or the VA) alleging numerous violations of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e et <u>seq.</u>, the Fourth Amendment to the United States Constitution, and 18 U.S.C. § 1001.  On December 12, 2017,

the Court dismissed Plaintiff's Amended Complaint and granted Plaintiff leave to file a Second Amended Complaint, limited only to his Title VII claims. (Doc. #38.) Plaintiff filed a Second Amended Complaint on January 10, 2018. (Doc. #41.)

As best the Court can gather,[1] Plaintiff believes that Bay Pines VA Police Chief Robert Shogren (Chief Shogren) and Lieutenant Pete Quimby (Lieutenant Quimby) orchestrated a scheme to sabotage Plaintiff's career at the VA by creating "a disciplinary paper trail against [him]," (Doc. #17, p. 41), which ultimately resulted in the termination of Plaintiff's employment. The alleged motive or motives for this scheme are not entirely clear to the Court, but Plaintiff's "prior turbulent relationship" with Lieutenant Quimby" (id. p. 41), Chief Shogren's "corrupt" nature (id. p. 6), and Plaintiff's extra-marital affair with another Clinic employee, Lizabeth Marsh (Ms. Marsh) (id. pp. 8, 12) seemingly all played a part.[2] According to Plaintiff, other individuals were involved in

---

[1] The Court cites to both the Amended Complaint (Doc. #17) and the Second Amended Complaint (Doc. #41) for the allegations of fact relevant to the instant Motion to Dismiss. While ordinarily an amended complaint supersedes an original complaint, the Eleventh Circuit has recognized an exception for when the amended complaint references the original complaint. Varnes v. Local 91, Glass Bottle Blowers Ass'n of U.S. & Canada, 674 F.2d 1365, 1370 n.6 (11th Cir. 1982). Because the Second Amended Complaint references the allegations of fact stated in the Amended Complaint, the Court treats the Amended Complaint as being incorporated into the Second Amended Complaint.

[2] Ms. Marsh worked as a medical support assistant at the Clinic. (Doc. #17, p. 9.)

- 2 -

the scheme, including Jeff Marsh (Mr. Marsh) - Ms. Marsh's then-husband,[3] Sergeant Walter Slam (Sergeant Slam), and Officer Ron Testa (Officer Testa).

Plaintiff claims he made several requests to meet with Chief Shogren to discuss his concerns regarding his treatment at the Clinic – particularly related to his relationship with Ms. Marsh - but was continually rebuked. (Id. pp. 16, 18.) On June 15, 2012, Plaintiff filed a request for "informal counseling" with an EEOC Counselor (id. p. 18), and he met with an EEOC representative on July 24, 2012. (Doc. #17-2, p. 18.) On September 13, 2012, EEOC Counselor Kelley Schafer sent Plaintiff a letter informing him that his file was being closed and that he had fifteen (15) days to file a formal complaint. (Doc. #17, p. 18.) Plaintiff did not do so at that time, but he did attend a mediation session with Chief Shogren on September 14, 2012. (Id. p. 16.)

Mediation was unsuccessful and, on September 19, 2012, Chief Shogren issued Plaintiff a Proposed Removal of Employment letter (the Proposed Removal Letter), which charged the following misconduct: (1) endangering the safety of a supervisor; (2) conduct unbecoming of a police officer; (3) failure to follow supervisory instructions; and (4) inappropriate conduct in the workplace. The

---

[3] Plaintiff claims that Mr. Marsh searched his then-wife's cell phone and photographed explicit text messages she had exchanged with Plaintiff, which Mr. Marsh then provided to Clinic personnel. (Id. p. 16.)

first charge relates to an incident in June or July 2012 in which Plaintiff allegedly placed Sergeant Slam in a chokehold. (Doc. #17, p. 22.) The second charge deals with a heated argument (a "lover's quarrel") between Plaintiff and Ms. Marsh at the Clinic on April 26, 2012, which was overheard by Officer Testa.[4] (Id. p. 14.) The third charge arises out of Plaintiff's disobeying Lieutenant Quimby's order that Plaintiff have no contact with Ms. Marsh during work hours. (Id.) The fourth charge is based on the allegation that Plaintiff and Ms. Marsh engaged in sexual relations on VA property on or around November 5, 2011.[5] (Id. p. 16.)

Plaintiff submitted a written response to the Proposed Removal Letter and met with Bay Pines VA Director Susanne Klinker (Director Klinker) on October 12, 2012 to discuss the charges. (Doc. #17-4, p. 12.) In a letter dated October 19, 2012, Director Klinker sustained the four charges and terminated Plaintiff's employment, effective October 27, 2012. (Id. pp. 9-10.)

Plaintiff then filed a "mixed case complaint" with the Merit Systems Protection Board (MSPB) pursuant to 29 C.F.R. §

---

[4] Officer Testa reported the incident one week later, after which Plaintiff's "VA law enforcement authority" was suspended. (Doc. #17, p. 15.)

[5] The evidentiary basis for this charge was, in large part, the text messages provided by Mr. Marsh.

- 4 -

1614.302(b), alleging discrimination claims under Title VII.[6] (Id. pp. 20, 38.)  The MSPB held a hearing on April 9, 2014 and sustained Plaintiff's termination, finding good cause for the removal and concluding Plaintiff had failed to show discriminatory motives underlying the termination.  (Id. pp. 38-39.)  Plaintiff appealed that decision to the EEOC, which affirmed the MSPB's findings on March 2, 2016.  (Id. p. 39.)  This lawsuit followed. The Court has jurisdiction over Plaintiff's "mixed" case pursuant to 5 U.S.C. § 7703(b)(2).  Perry v. Merit Sys. Prot. Bd., 137 S. Ct. 1975, 1981 (2017); Kloeckner v. Solis, 568 U.S. 41, 50 (2012).

## II.

According to Plaintiff, the events underlying these charges either never occurred (sex on VA property; the no-contact order) or were overblown (the private "lover's quarrel" with Ms. Marsh; the "playful" chokehold).  He contends that the fact that he was fired and Ms. Marsh – a Hispanic female – was only suspended for three days proves that the VA discriminated against him based on his race, national origin, and gender.

Defendant now moves to dismiss Plaintiff's Second Amended Complaint.  Defendant contends that Plaintiff has not alleged the facts necessary to state actionable claims under Title VII.

---

[6] A "mixed case" is one in which a federal employee alleges that he was subjected to an adverse "personnel action" that was motivated, at least in part, by discrimination.  Kloeckner v. Solis, 568 U.S. 41, 44 (2012); Sarhan v. Dep't of Justice Fed. Bureau of Prisons, 716 F. App'x 871, 874-75 (11th Cir. 2017); 29 C.F.R. § 1614.302.

**III.**

Federal Rule of Civil Procedure 8(a) governs pleading requirements for complaints and demands a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The United States Supreme Court has interpreted this language as requiring the complaint to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To do so requires "enough facts to state a claim to relief that is plausible on its face." Id. at 570. This plausibility pleading obligation demands "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) ("Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." (citation omitted)). Instead, the complaint must contain enough factual allegations as to the material elements of each claim to raise the plausible inference that those elements are satisfied, or, in layman's terms, that the plaintiff has suffered a redressable harm for which the defendant may be liable.

If the defendant does not believe the allegations show the plaintiff is legally "entitled to relief," it may move to dismiss

the case under Federal Rule of Civil Procedure 12.  In evaluating a Rule 12 motion to dismiss, the Court must accept as true all factual allegations in the complaint and "construe them in the light most favorable to the plaintiff."  <u>Baloco ex rel. Tapia v. Drummond Co.</u>, 640 F.3d 1338, 1345 (11th Cir. 2011).  However, mere "[l]egal conclusions without adequate factual support are entitled to no assumption of truth."  <u>Mamani v. Berzain</u>, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted).

A pleading drafted by a party proceeding *pro se*, like the Second Amended Complaint at issue here, is held to a less stringent standard than one drafted by an attorney, and the Court will construe the allegations contained therein liberally.  <u>Jones v. Fla. Parole Comm'n</u>, 787 F.3d 1105, 1107 (11th Cir. 2015).  Nevertheless, "a pro se pleading must suggest (even if inartfully) that there is at least some factual support for a claim; it is not enough just to invoke a legal theory devoid of any factual basis."  <u>Id.</u>  Put simply, even a *pro se* complaint must set forth claims the court has the power to resolve and allege facts showing that each cause of action is facially plausible.

## IV.

### A.   Title VII - Discrimination, Harassment, Retaliation

Although the Second Amended Complaint cites only Title VII generally, the Court will proceed under Section 2000e-16, which applies to federal employers.  <u>See</u> <u>Canino v. U.S. E.E.O.C.</u>, 707 F.2d 468, 472 (11th Cir. 1983) (observing that Section 2000e-16

"is the exclusive remedy for charges brought against federal employers including reprisals"); see also 5 U.S.C. § 7703(a)(2). As relevant here, that section mandates that "[a]ll personnel actions affecting employees . . . in executive agencies . . . be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).

Before continuing, the Court notes that the language in Section 2000e-16(a) is a bit different from that contained in the anti-discrimination provision pertaining to private employers.[7] The Eleventh Circuit "ha[s] not addressed, in a published opinion, whether § 2000e-2(a) . . . and § 2000e-16(a) are legally equivalent."  Putman v. Sec'y, Dep't of Veterans Affairs, 510 F. App'x 827, 829 (11th Cir. 2013) (per curiam).  It has, however, noted that "other Circuits have so held" and more than once

---

[7] 42 U.S.C. § 2000e-2(a)(1) makes it an "unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  This provision has been interpreted as protecting against "the creation or perpetuation of a discriminatory work environment," also known as a "hostile work environment."  Vance v. Ball State Univ., 133 S. Ct. 2434, 2440 (2013); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-67 (1986).  Title VII also expressly prohibits private employers from retaliating against an employee "on account of [that] employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2522 (2013) (citing 42 U.S.C. § 2000e-3(a)).

"assume[d] . . . that the coverage is the same."[8]  Id.; Thomas v.
Miami Veterans Med. Ctr., 290 F. App'x 317, 319 (11th Cir. 2008)
(per curiam) ("[D]espite the differences in language, Title VII
places the same restrictions on federal agencies as it does on
private employers." (citing Czekalski v. Peters, 475 F.3d 360, 363
(D.C. Cir. 2007))).  Accordingly, in addressing the viability of
Plaintiff's Title VII claims, the Court proceeds on the presumption
that those claims are actionable under Section 2000e-16, as they
would be against a private employer under 42 U.S.C. § 2000e-2(a).

### 1.    Discrimination - Disparate Treatment

#### a)    Race, National Origin, and Gender

The Court begins by considering Plaintiff's claim that the VA
discriminated against him because of his gender (male), race
(Caucasian), and national origin (northern European).

"Employment discrimination claims all require proof of
discriminatory intent."  Trask v. Sec'y, Dep't of Veterans
Affairs, 822 F.3d 1179, 1192 (11th Cir. 2016) (citation omitted).

---

[8] Moreover, the pre-split Fifth Circuit held that "the 1972
amendments extending the protections of Title VII to federal
employees . . . were intended to give federal employees the same
rights as private employees," including "bar[ing] reprisals
against federal employees who file charges of discrimination."
Porter v. Adams, 639 F.2d 273, 278 (5th Cir. 1981).  That holding
is binding precedent on this Court.  Bonner v. City of Prichard,
661 F.2d 1206, 1207 (11th Cir. 1981).

Where no direct evidence of discriminatory intent exists,[9] establishing "a prima facie case for disparate treatment in an employment discrimination case" requires the plaintiff to show that: "(1) []he is a member of a protected class; (2) []he was subjected to an adverse employment action; (3) h[is] employer treated similarly situated employees outside of h[is] protected class more favorably than []he was treated; and (4) []he was qualified to do the job." Id. (citation omitted); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Establishing the third factor typically requires the plaintiff to identify a proper "comparator" – that is, someone who - protected characteristic aside - is "nearly identical" to the plaintiff. Id.; see also Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) ("In order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the [proposed comparator]."); Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 n.6 (11th Cir.) ("[N]o plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule

_____

[9] Direct evidence "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination." Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla., 256 F.3d 1095, 1111 (11th Cir. 2001).

and who was, in fact, treated better."), opinion modified by, 151 F.3d 1321 (11th Cir. 1998). "If two employees are not 'similarly situated,' the different application of workplace rules does not constitute illegal discrimination." Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999).

Plaintiff alleges that "proof" of discriminatory intent for Plaintiff's race, national origin, and gender discrimination claims lies in the fact that, whereas he was fired for the affair, Ms. Marsh – a Hispanic woman – was only suspended for three days. Plaintiff asserts that Ms. Marsh is an adequate comparator because (1) although they shared different immediate supervisors, they both had "the same ultimate supervisor"; and (2) Plaintiff and Ms. Marsh both engaged in the same "initial and primary violation." (Doc. #41, p. 7.) Defendant argues that these claims must be dismissed because it is clear that Ms. Marsh was not "similarly situated" to Plaintiff. Without an adequate comparator, Defendant continues, it will be impossible for Plaintiff to establish the third element of his prima facie case.

"[A] plaintiff is not required to plead a prima facie case of discrimination in order to survive dismissal." McCone v. Pitney Bowes, Inc., 582 F. App'x 798, 801 n.4 (11th Cir. 2014) (per curiam). Nonetheless, the claim as pled must still be "facially plausible," that is, it must "allow the court to draw the reasonable inference that [the defendant] [i]s liable for . . . [the] discrimination [charged]." Id. at 801. In other words,

while the failure to plead a particular discrimination element does not mandate dismissal, it can constitute grounds for dismissal where it is apparent that the plaintiff will never be able to carry his burden of proof on that element.  See Evans v. Ga. Reg'l Hosp., 850 F.3d 1248, 1254 (11th Cir. 2017).

The Court agrees that Plaintiff's race, national origin, and gender discrimination claims are facially implausible because there is no viable comparator.  Although Plaintiff and Ms. Marsh shared the same ultimate supervisor, Plaintiff and Ms. Marsh worked under different immediate supervision and had entirely different jobs (she was a medical assistant and Plaintiff was a police officer)  (Doc. #17-2, p. 16.)  Moreover, Ms. Marsh was never charged with infractions comparable to those of Plaintiff.  She was never charged with endangering the safety of a supervisor (she was not involved in the altercation between Plaintiff and Sergeant Slam), conduct unbecoming a police officer (she was not a police officer), or failure to follow supervisory instructions (she was not given a no-contact order).  Where the proposed comparator works in a different department, has different job duties, answers to a different supervisor, and has fewer disciplinary infractions, then she is categorically not similarly situated "in all relevant aspects" and thus "not a proper comparator."  Foster v. Biolife Plasma Servs., LP, 566 F. App'x 808, 812 (11th Cir. 2014) (per curiam); see also Bessemer, 137 F.3d at 1312-13 (no "similarity" where proposed comparators committed one act of misconduct and

plaintiff committed two); Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.").

There are no allegations in the Second Amended Complaint from which the Court may infer that another potential comparator exists. Accordingly, Plaintiff's race, national origin, and gender disparate treatment discrimination claims are not plausible on their face. See Bessemer, 137 F.3d at 1311 ("If [a] Plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, [his] case must fail because the burden is on [him] to establish [a] prima facie case.").

### b) Religion

Plaintiff's religious discrimination claim is a bit different. Plaintiff, who identifies as Protestant, alleges he "was stigmatized for allegedly committing adultery and fornication." (Doc. #17, p. 47.) In support thereof, Plaintiff cites a conversation in which Sergeant Slam stated "he was no longer interested in having theological conversations with the Plaintiff, as [they] had done in the past, because the Plaintiff was now divorced and was in sin with his relationship with Lizabeth Marsh." (Doc. #17, p. 46.) In further support of his religious discrimination claim, Plaintiff alleges that Sergeant Slam hid Plaintiff's car keys and locked Plaintiff out of his office. (Doc. #41, p. 10.)

Plaintiff also points to his pre-termination hearing with Director Klinker, during which she corrected Plaintiff's miscategorization of Mr. Marsh as Ms. Marsh's "ex-husband" (which he was not yet) in an "emphatic seething tone" while looking at Plaintiff with "a piercing glare . . . ." (Id.) According to Plaintiff, this illustrated her "religious concern" about his behavior, which in turn motivated her decision to fire him. (Doc. #17, pp. 45-46.)

Read liberally, Plaintiff's claim appears to be one of discrimination due to religious "nonadherence," rather than an archetypal disparate treatment claim. A religious nonadherence claim, sometimes referred to as a "reverse religious discrimination" claim, alleges that the failure to conform one's religious beliefs and/or conduct to an employer's pious expectations resulted in an adverse employment action. See, e.g., Noyes v. Kelly Servs., 488 F.3d 1163, 1168-69 (9th Cir. 2007); Shapolia v. Los Alamos Nat. Lab., 992 F.2d 1033, 1037-38 (10th Cir. 1993); cf. Young v. Sw. Sav. & Loan Ass'n, 509 F.2d 140, 141 (5th Cir. 1975) ("Congress, through Title VII, has provided the courts with a means to preserve religious diversity from forced religious conformity.").

The operative question here is whether the Second Amended Complaint pleads a facially plausible religious nonadherence claim. A plaintiff alleging religious discrimination usually must

establish the same multi-factor prima facie case discussed above.[10] <u>Lubetsky v. Applied Card Sys., Inc.</u>, 296 F.3d 1301, 1305 (11th Cir. 2002).  However, a number of Circuit Courts of Appeals have employed a more relaxed prima facie standard for nonadherence claims which does not include the "protected class" factor. <u>Shapolia</u>, 992 F.2d at 1038; <u>Noyes</u>, 488 F.3d at 1168-69. Specifically,

> in order to establish a prima facie case in actions where the plaintiff claims that he was discriminated against because he did not share certain religious beliefs held by his supervisors, . . . the plaintiff must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

<u>Shapolia</u>, 992 F.2d at 1038; <u>see</u> <u>Noyes</u>, 488 F.3d at 1168 (finding "instructive" <u>Shapolia</u>'s treatment of "non-adherence" religious discrimination claims); <u>see also</u> <u>Venters v. City of Delphi</u>, 123 F.3d 956, 972 (7th Cir. 1997) ("We agree with our colleagues in the Tenth Circuit that the accommodation framework on which the district court relied has no application when the employee alleges that he was fired because he did not share or follow his employer's religious beliefs." (citing <u>Shapolia</u>, 992 F.2d at 1038)).  While

---

[10] The plaintiff must also "present . . . evidence that the decision-maker knew of his religion" or beliefs.  <u>Lubetsky</u>, 296 F.3d at 1306.

the Eleventh Circuit does not appear to have expressly addressed whether a different prima facie standard applies to nonadherence religious discrimination claims, that court has "repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible" and has entertained cases in which "the evidence does not fit neatly into the classic prima facie case formula." Schoenfeld v. Babbitt, 168 F.3d 1257, 1268 (11th Cir. 1999) (citations omitted).

Ultimately, regardless of whether the Eleventh Circuit would follow the formula laid out in Shapolia or continue to apply the traditional discrimination framework, this Court must conclude that the Second Amended Complaint does not plead a plausible religious discrimination claim.  First, Plaintiff has not alleged he was treated worse than a non-Protestant, and thus he has not pled a "routine" disparate treatment claim.[11]  Second, while Plaintiff may have been upset by Sergeant Slam's refusal to continue engaging in theological conversations, that refusal unquestionably does not constitute an "adverse employment action" – that is, "a *serious and material* change in the terms, conditions, or privileges of employment."  Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse

---

[11] The Second Amended Complaint contains no mention of Ms. Marsh's religion, if any.

as viewed by a reasonable person in the circumstances."). Moreover, Sergeant Slam's alleged hiding of Plaintiff's keys and locking Plaintiff out of his office is insufficient to support an inference that Sergeant Slam's actions "were taken because of a discriminatory motive" based upon Plaintiff's nonadherence. Shapolia, 992 F.2d at 1038.

Finally, while Director Klinker's termination of Plaintiff's employment with the VA was, undeniably, an adverse employment action, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, (1998), her "piercing glare" and the "emphatic seething tone" she allegedly used when discussing the Marshes' marital status is insufficient to permit an inference that she fired Plaintiff because he did not hold or adhere to her religious beliefs.

### 2) Hostile Work Environment – Religious Harassment

Plaintiff also attempts to assert a Title VII hostile work environment claim based on religious harassment. "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788
(1998). Moreover, a "[plaintiff] cannot make actionable ordinary
workplace tribulations by turning a 'personal feud' between
[him]self and a coworker into a Title VII religiously hostile work
environment claim." Alhallaq v. Radha Soami Trading, LLC, 484 F.
App'x 293, 296 (11th Cir. 2012) (per curiam).

Even reading the Second Amended Complaint liberally, the
Court can find only one factual allegation[12] supporting Plaintiff's
hostile work environment claim: Sergeant Slam's aforementioned
refusal to discuss religion with Plaintiff because Plaintiff was
divorced and living "in sin." (Doc. #17, p. 45.) Again, while
this singular incident may have truly offended Plaintiff, it is
not sufficient to allege a facially plausible hostile work
environment claim based on religious harassment.[13] See Alhallaq,
484 F. App'x at 296 (affirming dismissal of religious harassment
claim brought by Muslim plaintiff who was subjected to constant
Christian gospel music, called "dirty," and told to "burn in Hell,"

---

[12] In support of his hostile work environment claim, Plaintiff also
asserts that he was forced to undergo investigation, "thwarted
from contacting the EEOC, wrongfully accused of meeting with [his]
girlfriend outside breaks and lunches, [and] was told by Detective
Tim Torain he would never wear a police badge again." (Doc. #41,
p. 11.) Plaintiff, however, alleges no facts plausibly indicating
that any of these events were religiously motivated.

[13] Plaintiff asserts that the "Hostile Work Environment was not
only based on Religious Harassment but Law Enforcement Harassment
due to race, color, sex, and national origin." (Doc. #41, p. 11.)
However, Plaintiff alleges no facts substantiating a hostile work
environment claim on the basis of Plaintiff's race, gender, or
national origin.

since such conduct – "albeit rude and insensitive" – was not "sufficiently severe or pervasive").  Indeed, Sergeant Slam's decision to <u>not</u> discuss religion with Plaintiff seems the very opposite of religious harassment.

### 1) Retaliation

Lastly, Plaintiff asserts that a "culture of retaliation" developed after he sought informal counseling with the EEOC on June 15, 2012.  (Doc. #17, p. 19.)  To establish a prima facie case of retaliation under Title VII, "a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events."  <u>Goldsmith v. Bagby Elevator Co.</u>, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006)).  Unsurprisingly, "[t]he filing of an EEOC claim is a 'statutorily protected activity.'" <u>Burgos v. Napolitano</u>, 330 F. App'x 187, 189 (11th Cir. 2009) (per curiam) (quoting <u>Goldsmith</u>, 513 F.3d at 1277)).

Defendant argues that Plaintiff cannot establish the requisite causal link between his protected activity and the adverse action because (1) the investigation resulting in Plaintiff's termination began in April 2012, at least two months *before* Plaintiff ever contacted the EEOC, and (2) Plaintiff was fired on October 19, 2012 - more than four months after he contacted the EEOC.  The Court agrees.

Where "temporal proximity" is the only evidence of a "causal relation" offered, that proximity must be "very close" to allow an inference of causation.  Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citations omitted); Grier v. Snow, 206 F. App'x 866, 869 (11th Cir. 2006) (per curiam).  Four months – even three months – is unquestionably too long.  E.g., Breeden, 532 U.S. at 273; Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).  Importantly, however, the proximity clock begins to run not on the date the plaintiff engages in protected activity, but on the date the decision-maker gains "knowledge of [that] protected activity."  Breeden, 532 U.S. at 273; see also Smith v. City of Fort Pierce, Fla., 565 F. App'x 774, 778 (11th Cir. 2014) (per curiam) ("A plaintiff establishes a causal connection by showing that the relevant decision-maker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" (quoting Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002))).

The Second Amended Complaint – like the Amended Complaint – is unclear as to when Director Klinker first learned that Plaintiff had filed an EEO complaint.[14]  In the end, that fact does not matter.  Even if she found out shortly before she decided to sustain the charges and terminate Plaintiff's employment with the

---

[14] Plaintiff asserts that Director Klinker learned that he filed an EEO complaint in June of 2012, yet provides a quote in which Director Klinker states she "do[es] not recall."  (Doc. #41, p. 15.)

VA, those charges had indisputably already been levied against Plaintiff and his removal proposed.[15]  In other words, in deciding to fire Plaintiff, Director Klinker was merely "proceeding along lines previously contemplated."  Breeden, 532 U.S. at 1511.  That fact negates any possibility of causality based on temporal proximity.  Id.; see also Smith, 565 F. App'x at 779 (no retaliatory causation where employer "had already contemplated disciplining [plaintiff] before she filed her Charge").  Since the Second Amended Complaint contains no other facts from which the Court may plausibly infer causation, Plaintiff's retaliation claim is dismissed.

In its previous Opinion and Order (Doc. #38), the Court detailed the Amended Complaint's deficiencies and provided Plaintiff with specific instructions on how to comply with the Federal Rules.  However, Plaintiff has failed to resolve those deficiencies and has again filed an insufficient pleading.  The Court will afford Plaintiff **one** last opportunity to file a **concise** Third Amended Complaint that fixes the pleading deficiencies discussed herein; no further amendments will be permitted.

The Court again **strongly** encourages Plaintiff to consult the "Proceeding Without a Lawyer" resources provided at the following website: http://www.flmd.uscourts.gov/pro_se/default.htm.  This site

---

[15] The September 19, 2012 Proposed Removal Letter, which was attached to Plaintiff's Amended Complaint (Doc. #17-4, pp. 4-8), was issued more than three months after Plaintiff sought EEOC counseling, thus falling outside the causation proximity window.

has tips, answers to frequently-asked questions, and sample forms which may help Plaintiff generate a clear, non-repetitive Third Amended Complaint.

Accordingly, it is hereby

**ORDERED:**

1.   Defendant's Motion to Dismiss (Doc. #49) is **GRANTED** and Plaintiff's Second Amended Complaint (Doc. #41) is **DISMISSED WITHOUT PREJUDICE.**

2.   Plaintiff may file a Third Amended Complaint within fourteen (14) days of the date of this Opinion and Order.

**DONE and ORDERED** at Fort Myers, Florida, this 3rd day of August, 2018.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Parties and Counsel of Record